# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARMIN WALKER, individually and on behalf of all others similarly situated | : : : | **Case No.: 3:14-cv-01406-MPS** |
| Plaintiff, | : : | |
| v. | : : | |
| BOLT TECHNOLOGY CORPORATION, RAYMOND M. SOTO, MICHAEL HEDGER, JOSEPH ESPESO, KEVIN CONLISK, MICHAEL FLYNN, GEORGE KABURECK, STEPHEN RYAN, PETER SICILIANO, GERALD SMITH, TELEDYNE TECHNOLOGIES INCORPORATED, AND LIGHTNING MERGER SUB, INC. | : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | **October 23, 2014** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Armin Walker, Mark Halstrom, Andrew Post and Shiva Y. Stein ("Plaintiffs"),[1] on behalf of themselves and all others similarly situated, by and through the undersigned counsel, allege the following upon information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiffs, which are alleged upon personal knowledge:

### SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiffs on behalf of themselves and all other similarly situated public stockholders of Bolt Technology Corporation ("Bolt" or the

---

[1] Pursuant to this Court's Order, dated October 16, 2014, Plaintiffs' counsel conferred with counsel for Plaintiff Kimberly A. Linnemeyer on October 23, 2014 regarding whether Ms. Linnemeyer would join in the filing of this amended complaint.  Ms. Linnemeyer declined.  Plaintiffs are filing this amended complaint pursuant to this Court's October 27, 2014 and reserve their right to oppose the removal of their actions.

"Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants") for breaches of fiduciary duties, and against Teledyne Technologies Incorporated ("Teledyne") and Lightning Merger Sub, Inc. ("Merger Sub") for aiding and abetting such breaches of fiduciary duties.

2.      Headquartered in Norwalk, Connecticut, Bolt is a leading developer, manufacturer, and retailer of marine seismic data acquisition equipment and underwater remotely operated robotic vehicles worldwide through its four distinct business segments.  In its Seismic Energy Sources segment, the Company develops, manufactures, and sells seismic energy sources, such as air guns, used in seismic exploration to create acoustic waves at frequencies that penetrate the ocean bed and assist in the exploration of offshore gas and natural gas concentrations.  Bolt's Underwater Cables and Connectors segment provides the necessary cables to link its seismic energy sources to the vessel itself and develops the necessary monitoring devices to ensure that the equipment functions properly.  In its Seismic Energy Source Controllers segment, the Company develops, manufactures, and sells controllers and synchronizers, including data loggers and auxiliary equipment, for seismic energy sources.  Finally, the Company's Underwater Robotic Vehicles segment manufactures mini underwater remotely operated vehicles used to perform a multitude of submarine tasks.

3.      On September 3, 2014, the Company announced that it had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") with Teledyne pursuant to which Merger Sub will merge with and into the Company, rendering the Company a wholly owned subsidiary of Teledyne (the "Proposed Transaction").  As a result of the merger, Bolt stockholders are anticipated to receive $22.00 in cash in exchange for each share of Bolt they own (the "Merger

Consideration").  The aggregate value of the Proposed Transaction is approximately $171 million, taking into account Bolt's stock options outstanding and net cash as of March 31, 2014.

4.     The Proposed Transaction undervalues Bolt and is the result of an entirely unfair sales process during which the Board sought to sell the Company to Teledyne, and only Teledyne; foreclosing the opportunity to engage in a robust auction process designed to maximize stockholder value.  The $22.00 Merger Consideration is wholly insufficient based upon, among other things, the Company's stock price, which traded near or above the Merger Consideration as recently as the first quarter of 2014.  Furthermore, the Company's stock price in the recent past has been artificially deflated because of Company management's caution related to future orders in its underwater robotic division, while failing to properly value Bolt's recent breakthroughs in its Seismic Energy Sources segment.

5.     Moreover, given the overall strength of the Company and its poise for continued control over its niche market, Teledyne will acquire Bolt at an unreasonably low price if the Proposed Transaction is permitted to close.  Prior to the announcement of the deal, the Company reported highly positive financial results for Fiscal Year ended June 30, 2014.  On August 13, 2014, the Company reported that, for the fiscal year, Bolt recorded sales in the amount of $67.5 million, a 17% increase over the prior year.  The Company also enjoyed a 32% increase in income before income taxes and net income of nearly $8.15 million (or $0.94 of earnings per share), as compared to $6.7 million in the prior year.  These results were achieved despite a $2.5 million contingent earnout charge and were driven by the success of the Company's underwater robotic vehicle unit.

6.     As such, the Proposed Transaction is the product of a flawed process that was designed to ensure the sale of Bolt to Teledyne on terms preferential to defendants and other Bolt

insiders and will subvert the interests of Plaintiffs and the other public stockholders of the Company.

7.     Bolt stockholders are not getting the benefit of a value-maximizing transaction through an open auction process.  Moreover, the Board pursued a transaction with Teledyne without any reasonable basis for determining the intrinsic value of the Company.  Indeed, in the mere two and a half month "process" leading up to the Proposed Transaction, the Board failed to conduct any market check or instruct its financial advisor, Johnson Rice & Company L.L.C. ("Johnson Rice") to gauge the interest of other potential transaction partners, before agreeing to the inadequate Merger Consideration.

8.     Exacerbating the unfairness of the Proposed Transaction, the Individual Defendants issued a materially incomplete and misleading Definitive Proxy Statement filed on Schedule 14A with the United States securities and Exchange Commission ("SEC") on October 7, 2014 (the "Proxy Statement").  Specifically, the Proxy Statement, in violation of the Board's duty of candor under state law, fails to provide material information and provides the Company's stockholders with materially misleading information thereby rendering stockholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction at the November 17, 2014 special meeting of Bolt stockholders.

9.     Compounding the failure to provide adequate consideration and fully inform the Company's stockholders as to the true value of their holdings, the sales and negotiation process leading up to the consummation of the Merger Agreement was fundamentally flawed. Specifically, pursuant to the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a matching rights provision that requires

the Company to disclose confidential information about competing bids to Teledyne within twenty-four hours; (iii) a provision that provides Teledyne with five (5) business days to merely match any competing proposal in the event one is made; and (iv) a termination and expense fee provision that require the Company to pay Teledyne $7.5 million in order to accept an alternative, superior offer.

10.    In addition, each of the Individual Defendants and certain executive officers of the Company, who collectively own 5.6% of all outstanding shares of Bolt common stock have entered into shareholder agreements ("Shareholder Agreements") with Teledyne whereby they have agreed, *inter alia*, to vote their shares in favor of the Proposed Transaction.

11.    These deal protection provisions and Shareholder Agreements, particularly when considered collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Bolt.

12.    For these reasons and as set forth in detail herein, the Individual Defendants have breached their fiduciary duties to Plaintiffs and the Class (defined herein) and Teledyne and Merger Sub have aided and abetted such breaches.  Plaintiffs seek to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, candor and due care.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to this Court's Order dated October 16, 2014, requiring all plaintiffs whose cases have been consolidated in this Court confer

and file a single amended multiple-plaintiff complaint, encompassing the claims made in the several original complaints by October 27, 2014.[2]

14.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Bolt maintains its offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.  Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## PARTIES

15.     Plaintiffs are, and have been at all relevant times, the owners of common stock of Bolt.

16.     Bolt is a corporation organized and existing under the laws of the state of Connecticut, with its principal executive offices located at Four Duke Place, Norwalk, Connecticut 06854.  Bolt's common stock is traded on the NASDAQ Global Select Market exchange under the ticker symbol "BOLT."

17.     Defendant Raymond M. Soto ("Soto") is the Company's Chief Executive Officer and Chairman of the Board.  He has held these positions since 1990 and 1997, respectively.  Soto has been a member of the Board since 1979 and previously held the position of President of the Company from 1990 to November 2011.  Soto is also the Chair of the Company's Executive Committee.

18.     Defendant Michael Hedger ("Hedger") has been the President and Chief Operating Officer of the Company since November 2011, Executive Vice President of the Company from March 2010 to November 2011, President of A-G Geophysical products, Inc., a wholly-owned

---

[2] For the reasons stated in Plaintiffs' forthcoming Memorandum of Law to be filed with this Court on or before October 28, 2014, Plaintiffs believe that their actions should be remanded to the Superior Court of Connecticut.

subsidiary of the Company, since 2002, and a director of the Company since 2007.  Hedger is also a member of the Company's Executive Committee.

19.     Defendant Joseph Espeso ("Espeso") has been the Senior Vice President—Finance and Chief Financial Officer of the Company since 2001 and a director since 1999.

20.     Defendant Kevin Conlisk ("Conlisk") has been a director of the Company since 1996.  Conlisk is also a member of the Company's Executive, Audit, Executive Compensation, and Nominating Committees.

21.     Defendant Michael Flynn ("Flynn") has been a director of the Company since 2002.  Flynn is also the Chair of the Company's Nominating Committee and a member of the Executive Compensation Committee.

22.     Defendant George Kabureck ("Kabureck") has been a director of the Company since 2002.  Kabureck is also the Chair of the Company's Executive Compensation Committee and a member of the Nominating Committee.

23.     Defendant Stephen Ryan ("Ryan") has been a director of the Company since 2004.  Ryan is also a member of the Company's Executive Compensation and Nominating Committees.

24.     Defendant Peter Siciliano ("Siciliano") has been a director of the Company since 2011.   Siciliano is also a member of the Company's Audit, Executive Compensation, and Nominating Committees.

25.     Defendant Gerald Smith ("Smith") has been a director of the Company since 1993.  Smith is also the Chair of the Company's Audit Committee and a member of the Executive, Executive Compensation, and Nominating Committees.

26.     Defendant Teledyne is a corporation organized and existing under the laws of the state of Delaware, with principal executive offices located at 1049 Camino Dos Rios, Thousand

Oaks, California 91360, that manufactures and sells aerospace and defense products primarily in the United States and Canada.  Teledyne common stock is traded on the New York Stock Exchange under the ticker symbol "TDY."

27.     Defendant Merger Sub is a Connecticut corporation and wholly owned subsidiary of Teledyne.

28.     Collectively, Bolt, the Individual Defendants, Teledyne, and Merger Sub are referred to herein as the "Defendants."

### THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiffs and the other public shareholders of Bolt and owe them, as well as the Company, a duty of care, loyalty, good faith, independence, and full and fair disclosure.

30.     By virtue of their positions as directors and/or officers of Bolt, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Bolt to engage in the practices complained of herein.

31.     Specifically, when the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To comply with their fiduciary duties, the Individual Defendants may not take any action that:

> a.   adversely affects the value provided to the corporation's shareholders;

8

    b.  favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

    c.  adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

    d.  will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

32.    In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

    a.  participating in any transaction where the Individual Defendants' loyalties are divided;

    b.  participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

    c.  unjustly enriching themselves at the expense or to the detriment of the public shareholders.

33.    Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiffs and the other stockholders of Bolt, including their duties of loyalty, good faith, due care and independence, insofar as they, *inter alia*, failed to obtain the best price possible under the circumstances before entering into the Proposed Transaction, and engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiffs or the other stockholders of Bolt common stock.

## CLASS ALLEGATIONS

34.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and/or entities that own Bolt common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

35.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the Class.  According to the Merger Agreement, approximately 8.7 million shares of Bolt common stock are issued and outstanding.  All members of the Class may be identified from records maintained by Bolt or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

36.     Questions of law and fact in common to the Class include, *inter alia*, the following:

   a.   Whether the Individual Defendants breached their fiduciary duties of undivided loyalty or due care with respect to Plaintiffs and the other members of the Class in connection with the Proposed Transaction;

   b.   Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably available under the circumstances for the benefit of Plaintiffs and the other members of the Class in connection with the Proposed Transaction;

   c.   Whether Teledyne and the Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

d. Whether Plaintiffs and the other members of the Class would be irreparably harmed if the transactions complained of herein were consummated.

37. Plaintiffs' claims are typical of claims of the other members of the Class. Plaintiffs and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

38. Plaintiffs are committed to prosecuting this action, will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiffs seeks to represent.

39. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.

40. Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest.

41. Defendants have acted on grounds generally applicable to the class, making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**A. Company Background and Position for Growth**

1. Introduction to the Company's Products and Services

42. Founded in 1960, Bolt is a leading worldwide developer and manufacturer of seismic energy sources, and seismic energy source controllers and synchronizers used in offshore seismic exploration for oil and gas. Bolt also develops and manufactures high-reliability underwater cables and connectors, as well as related electronic controllers, monitoring systems

and other auxiliary equipment. Through its SeaBotix business, Bolt has become the world-wide leader in the design, manufacture and sale of underwater remotely operated vehicle (ROV) systems, used in maritime security, search and rescue, aquaculture, and scientific research applications.

2.   <u>The Company is Well-Positioned for Future Growth</u>

43.   The Company's success began in the 1960s, when it revolutionized marine seismic exploration with the introduction of air gun technology.  Since that infancy, Bolt has become the leading energy source supplier to the marine seismic industry.  As such, its vast proprietary product suite comprises key components needed by seismic exploration vessels to acquire seismic data, including: the energy source (air gun), synchronization (controller), and communication between the guns and the controller (cables).  The Company has no long-term debt and recently announced its highest revenue in fiscal 2014 over the last five years and its best pre-tax income since 2009.

44.   The Company has experienced consistent growth since the 1960s, a feat largely attributable to Bolt's continued investment in its growth strategy, including strategic acquisitions and product development.  For example, as early as 1999, the Company sought to complement its air gun business with the strategic acquisition of A-G Geophysical Products.  Under Bolt's guidance, A-G Geophysical Products since 1999 has become the leading supplier of underwater cables, connector, hydrophones and depth and pressure transducers to the marine seismic industry.

45.   In 2007 Bolt further bolstered its premier air gun business by acquiring Real-Time Systems.   Real-Time Systems specializes in a standard product line of seismic source synchronizing equipment, tailor made for synchronizing small or large air gun arrays.  Real-Time System products are distributed globally and include functions such as deep marine seismic

projects, marine research, ocean bottom cables, transition zones, and vertical seismic profile projects.

46.     Similarly, in January 2011, the Company expanded its vast group of propriety products yet again with the acquisition of SeaBotix Inc.  SeaBotix Inc. is the world's leading manufacturer of miniROV systems with a pedigree of underwater expertise.  In particular, SeaBotix produces the Hyball ROV, one of the most successful ROVs ever produced.  Together, the strategic acquisitions of A-G Geophysical Products, Real-Time Systems, and SeaBotix, Inc. have propelled Bolt to the forefront of the marine seismic exploration industry, and in particular, afforded Bolt an unmatched market position in air gun technology and related products.

47.     However, the Company's positive growth does not begin and end with strategic acquisitions.  Bolt is also dedicated to consistent product development and expanding its customer base, and such efforts have proved fruitful year over year.  Since the original PAR Air Gun invented by Bolt's founder Stephen Chelminski in the early 1960s became the predominant marine seismic energy source, the Company has continued to design and manufacture new seismic energy sources. In particular, Bolt supplies a wide range of seismic energy sources, including Marine Air Guns, Mud Guns for transition zone surveys, Portable Air Gun Systems for remote or environmentally sensitive areas, and Borehole Air Gun Tools for cross-well seismic surveys.

48.     Moreover, on September 19, 2011, Bolt announced that it had commenced joint efforts with WesternGeco, to develop the E-Source Air Gun, an environmentally sensitive energy source for marine seismic surveys.  The E-Source air gun is designed to optimize output in the seismic band, while suppressing the high-frequency components that contribute to acoustic impact and retaining the low-frequency components that are critical to seismic exploration.  Defendant Soto lauded the proposed new technology:

> In the early 1960's, we invented the marine seismic air gun and today our air guns are the most widely used marine seismic energy source in the world. By combining our unique air gun design and manufacturing experience with WesternGeco knowledge and research in the area of marine acoustics, we believe the new E-Source air gun could represent a significant new development in the geophysical industry. Once fully developed, the E-Source technology will be universally available to the industry.

49.     As a result of this continued product development, the Company has seen record level orders year over year. For example, on September 11, 2011, Bolt announced that its recently acquired subsidiary, SeaBotix Inc. had received record sales orders during August 2011 in excess of $3,500,000, including contracts to supply specialized RVOs to the United States Navy. This success continued throughout 2012 and well into 2013, when Bolt again announced record level orders, including a $4,600,000 order on April 16, 2013 for a Seismic Energy Source system. Individual Defendant Soto commented on the sale:

> We are pleased to have received this order, which includes the first sale of our recently introduced SmartSourceTM digital controller, and is the largest single order recorded in the Company's history.

50.     Impressively, the Company successfully topped this record order only a few months later when, on November 11, 2013, it announced that SeaBotix had received an order totaling in excess of $8,000,000 from the Explosive Ordinance Disposal groups of the United States Navy. The Company's customer base continued to grow exponentially throughout 2013 and to the present, when on August 13, 2014, the Company reported a 17% increase in consolidated sales fiscal year ended June 30, 2013.

51.     In light of these trends and clear indicators of continued success, Bolt is well positioned to enjoy both short and long-term growth in the marine seismic exploration industry.

    3.   The Company's Strong Financial Results

52.     From a financial perspective, the Company has taken full advantage of growth opportunities and capitalized on its growing customer base in recent years.  Beginning in January of 2013, the Company announced second quarter results for fiscal year 2013 on January 24, 2013, and boasted increased sales of $28,678,000, as compared to $24,160,000 of the same period the prior year.  As an indication of financial strength, Bolt also announced a quarterly dividend of $0.07 per common share and Defendant Soto aptly concluded, "we continue to be optimistic that fiscal year 2013 will be another successful year for our company."

53.     The third quarter of fiscal year 2013 saw a similar increase in sales.  Specifically, sales for the nine months ended March 31, 2013 amounted to $39,921,000 compared to $37,153,000 for the same nine month period in fiscal year 2012.  Net income for the period also increased to $4,786,000 from $4,251,000 the prior year.  Defendant Soto additionally announced the largest sales order in Company history to date, reporting a $4,600,000 order for a Seismic Energy Source System.  Remarking on the sizable order and the Company's steadily increasing sales, Defendant Soto noted, "we believe [the order] is an important milestone towards further growth in our marine seismic equipment business…We believe that fiscal year 2013 should be another successful year for our Company."

54.     Bolt was able to finish fiscal year 2013 with strong financial results, reporting fourth quarter and the 2013 fiscal year on August 13, 2013.  The Company boasted increased sales for the fourth quarter and the fiscal year, with year-end sales amounting to $57,842,000, compared to $52,610,000 for fiscal year 2012.  Again Defendant Solo positively concluded, "Fiscal year 2013 was a successful year for our Company and we look forward to continued success in fiscal year 2014."

55.     Remarkably, Bolt's success did continue into the 2014 fiscal year, and on October 24, 2013, the Company reported first quarter results including a 14% increase in sales year over year.  Equally as impressive, net income for the first quarter increased 39% to $2,363,000 from $1,704,000 in the first quarter of fiscal year 2013. Mr. Soto concluded, "we are pleased with the results of the first quarter of fiscal year 2014 and based on current customer orders and inquiries, we anticipate that fiscal year 2014 will be another successful year for our Company."

56.     As the Company strong financial position continued into the second quarter of 2014, Bolt announced that its Board of Directors had declared a special cash dividend of $0.50 per common share and a quarterly dividend of $0.09 per common share.  Commenting on the dividends, Defendant Soto celebrated the Company's financial stability:

> The Board's decision to declare the special cash dividend and the quarterly dividend reflect our strong financial position and our commitment to delivering shareholder value. After payment of these dividends, our cash levels and capitalization will remain strong and continue to provide the financial resources both to support our operations and allow us to pursue strategic opportunities to further enhance our shareholder value.

57.     Furthermore, the Company also announced second quarter financial results, including an astounding 77% increase in net income and 51% increase in sales as compared to the same quarter of the previous year.

58.     On April 24, 2014, Bolt announced its third quarter financial results and reported continued increases in sales and net income. Sales for the third quarter of fiscal year 2014 amounted to $15,716,000 compared to $11,243,000 of the third quarter 2013, while net income amounted to $2,456,000 as compared to $1,381,000 for the same quarter last year.

59.     Lastly, on August 13, 2014, Bolt released its fourth quarter and fiscal year 2014 earnings, reporting strong sales and net income for the year. Notably, for the fiscal year ended June 30, 2014, Bolt reported sales of $67,515,000, an increase of 17% compared to fiscal 2013. In

addition, the company reported that its net income rose 22% to $8,149,000 in fiscal 2014, compared to $6,700,000 for fiscal 2013. Bolt also reported that the company's income before income taxes and acquisition contingent earnout for 2014 increased 32% to $16,003,000, compared to $10,691,000 for fiscal 2013.  In announcing these results, Defendant Soto noted:

> Fiscal year 2014 was a very strong year for our Company despite the $2,500,000 contingent earnout charge and high research and development costs in connection with the development of our environmentally friendly marine seismic energy source. We are hopeful that fiscal year 2015 will be another successful year for the Company.

60.    Yet despite these confident indications of future financial growth, the Board decided to sell the Company for inadequate consideration, thereby depriving Bolt's public stockholders of the ability to enjoy the Company's promising long-term business prospects.

**B.  The Flawed Process Leading Up to the Proposed Transaction**

61.    The Proposed Transaction was the result of a rushed and flawed "process" with the Board locked into a sale to Teledyne from the outset.  The Board did nothing to ascertain the intrinsic value of the Company or conduct a market check to reasonably inform itself of Bolt's value and/or to secure a value-maximizing price for the Company.  Instead, the Board took part in purported "negotiations" leading up to the Proposed Transaction for the inadequate Merger Consideration that never resulted in Teledyne moving up from its initial offer for the Company.

62.    One June 12, 2014, William Kikendall ("Kikendall"), President of Teledyne's Marine Sensors Systems Group, contacted Bolt's President and Chief Operating Officer Michael Hedger ("Hedger") to schedule a discussion between the CEOs of the respective companies.  This call occurred on June 13, 2014, when Robert Mehrabian ("Mehrabian"), Teledyne Chairman, president and CEO and Individual Defendant Soto, spoke by phone.  During this conversation, Mr.

Mehrabian expressed Teledyne's interest in acquiring the Company and Individual Defendant Soto welcomed the opportunity to entertain the prospect.

63.     After executing mutual non-disclosure agreements leading to the exchange of non-public information on June 17, 2014, Teledyne delivered a letter of intent on June 18, 2014 – expressing its first and only offer to acquire the Company for the price of $22.00 per share.  Along with their offer, Teledyne also demanded a 45 day exclusivity provision.

64.     On July 10, 2014, more than three weeks after the receipt of the initial Teledyne offer, the Board had its first meeting to discuss the Proposed Transaction.  It was at this meeting that the Board determined that it would best suit the Company to pursue a sale and that the Company needed to engage a financial advisor to assist in the evaluation of the Teledyne offer. Conspicuously, while the Proxy states that the Board had not reached a conclusion as to a sale to Teledyne, it had determined to sell the Company to *someone*, yet made no effort to engage in a fulsome sales process designed to attract interested bidders.

65.     On July 16, 2014, the Company and Teledyne executed a 30 day exclusivity agreement with a standstill provision, thus commencing Teledyne's due diligence of the Company.

66.     On August 4, 2014, nearly a month after determining that it should engage a financial advisor and almost seven weeks following the initial Teledyne offer, the Board determined to engage Johnson Rice as its financial advisor.

67.     Notably, on August 10, 2014, Bolt returned a signed letter inexplicably extending the exclusivity period to August 31, 2014, at the request of Teledyne. Had the original 30 day agreement remained in effect, it would have expired on August 15, 2014.  During this initial exclusivity period, the Bolt Board met exactly once – on August 4, 2014 and received no guidance as to the fairness of the Teledyne offer from its financial advisor.

18

68.     On August 20, 2014, while now operating under the extended exclusivity agreement, the Board had a meeting with its financial advisor during which Johnson Rice concluded that an all cash offer of the Merger Consideration was within the range of fairness. Following this meeting, the Board instructed Individual Defendant Soto to request an increase in the consideration from Teledyne, which Teledyne declined to do.

69.     Teledyne reaffirmed its offer of $22.00 per share on August 21, 2014, except it now added an additional time constraint by requiring the Company to enter into a merger agreement no later than August 31, 2014.

70.     This deadline did not prove to be a hard cutoff date, however, as the companies continued to exchange drafts of the proposed merger agreement and shareholder agreement up through September 2, 2014, following the August 31, 2014 agreement by Teledyne to extend the deadline, along with the exclusivity agreement, until September 3, 2014.

71.     Now butting up against the extended deadline and with no other potential suitors because the Board had determined to lock the Company into the unduly burdensome exclusivity agreement, the Board agreed on September 3, 2014 at a special meeting to adopt the Merger Agreement and the transactions contemplated thereby, shackling the Company's stockholders to the insufficient Merger Consideration without even a cursory market check to determine what Bolt was worth on the open market.

**C.  The Proposed Transaction Undervalues Bolt Shares**

72.     On September 3, 2014, the Company issued a press releasing announcing the Proposed Transaction which stated in relevant part:

> THOUSAND OAKS, Calif. and Norwalk, Conn. – September 3, 2014 – Teledyne Technologies Incorporated (NYSE:TDY) ("Teledyne") and Bolt Technology Corporation (NASDAQ:BOLT) ("Bolt") jointly announced today that they have entered into a definitive agreement that provides for the merger of Bolt with a

wholly-owned subsidiary of Teledyne. Pursuant to the transaction, Teledyne will acquire all of the outstanding common shares of Bolt for $22.00 per share payable in cash. The definitive agreement contemplates that Bolt will pay its previously announced quarterly dividend of $0.09 per common share, payable on October 2, 2014, to stockholders of record on September 3, 2014. The aggregate value for the transaction is approximately $171 million, taking into account Bolt's stock options and net cash as of March 31, 2014. The transaction was unanimously approved by the Boards of Directors of Teledyne and Bolt. In addition, Bolt's directors and executive officers have agreed to vote their shares in favor of the transaction.

Since 1965, Bolt has been a leading supplier of marine seismic energy sources and replacement parts for offshore energy exploration. Bolt also develops and manufactures high-reliability underwater cables and connectors, as well as related electronic controllers, monitoring systems and other auxiliary equipment. Through its SeaBotix business, Bolt is a leading designer and manufacturer of miniature underwater remotely operated vehicles (Mini ROVs) used in maritime security, search and rescue, aquaculture, and scientific research applications.

"Bolt will broaden our rich portfolio of marine instrumentation with a number of highly complementary products," said Dr. Robert Mehrabian, Chairman, President and Chief Executive Officer of Teledyne. "Bolt's geophysical acoustic sources will fit well with our existing hydrophone arrays, which listen for the echoes from these sound sources. Bolt would also bring unique connector technology, products and customers to our subsea interconnect businesses. Finally, SeaBotix expands our marine systems business by adding inspection-class ROVs to our autonomous underwater vehicles (AUVs), while also providing more platforms to use our extensive line of marine sensors."

Raymond M. Soto, Bolt's Chairman and Chief Executive Officer, commented, "This transaction rewards our shareholders, while providing exciting opportunities for both our customers and employees. Our respective companies have complementary products and technology, and given Teledyne's resources, we believe that we can accelerate the development of new products, such as our environmentally friendly marine seismic energy source."

Johnson Rice & Company L.L.C. is acting as exclusive financial advisor and Levett Rockwood P.C. and Edwards Wildman Palmer LLP are acting as legal counsel to Bolt. McGuireWoods LLP is acting as legal counsel to Teledyne.

\* \* \*

73.     The Proposed Transaction undervalues Bolt's prospects and is the result of an

entirely unfair sales process.  Specifically, with the expected rollout of Bolt's eSource air gun in

the fourth quarter of 2015, the Company stands to further cement itself as the dominant force in the niche market of seismic energy sources used in underwater oil and gas exploration.

74.     The eSource air gun is an environmentally friendly seismic source that will allow for oil and gas exploration in those regions most sensitive to mammal regulations – the same regions from where one-third of all seismic acquisition revenue was derived in the last six years. The eSource will allow for its user to achieve the same seismic goals while leaving the smallest possible environmental footprint, all without any compromise in seismic data quality.  Importantly, the eSource is fully compatible with existing hangars, gun controllers and infrastructure providing high pressure air, so the required infrastructure investment is minimal.

75.     The revenue benefits the Company stands to gain from the release of the eSource in 2015 cannot be understated, as sales in the Company's seismic energy sources segment constituted approximately 75% of total revenues in 2013.  As restrictions on off-shore exploration of natural gas and oil deposits grow more stringent in the face of louder calls for bans on current seismic exploration technologies because of the environmental impact, Bolt stands above the rest as an innovator.   Furthermore, Bolt's current market share in the seismic gun market is approximately 70% -- a number that is expected to increase upon the release of the eSource.

76.     Yet, while the Company stands on the precipice of realizing the benefits of its investment in development of the eSource and is poised to further take over a niche segment it already dominates, the Board has determined to now sell the Company for inadequate consideration, thus cashing out Bolt stockholders that have loyally invested in the Company.

### D. The Merger Agreement Unfairly Deters Competitive Officers and is Unduly Beneficial to Teledyne

77.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate

conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing

offers will emerge for the Company.

78.     First, Section 5.2 broadly provides that neither Bolt, nor any of its affiliates, may

solicit or proactively seek a competing and better offer, nor can they provide information to, or

engage in discussions with, any potential bidder for the Company.  The section states, in relevant

part:

> the Company shall not, nor shall it permit any of its Subsidiaries to, nor shall it
> authorize or permit any of its officers, directors, or employees or any Affiliate,
> investment banker, financial advisor, attorney, accountant, or any other
> representative retained by it or any of its Subsidiaries to, directly or indirectly, (i)
> solicit, initiate or knowingly encourage (including by way of furnishing
> information which has not been previously publicly disseminated), or take any
> other action intended to facilitate or encourage, any inquiries or the making of any
> proposal which constitutes, or may reasonably be expected to lead to, any Takeover
> Proposal, (ii) conduct, participate, or engage in any discussions or negotiations or
> provide any non-public information or data to any Person, regarding any Takeover
> Proposal, (iii) approve, endorse, recommend, make or authorize any public
> statement, recommendation or solicitation in support of any Takeover Proposal or
> (iv) approve any transaction (other than the transactions contemplated hereby)
> pursuant to which any Person other than Parent, Merger Sub or any Subsidiary of
> Parent would become an "interested shareholder" under, Section 33-844 of the
> CBCA or (v) terminate, amend or waive any material rights under (or fail to take
> commercially reasonable steps to enforce rights under) any "standstill" or other
> similar agreement between the Company or any of its Subsidiaries and any other
> Person (other than Parent, Merger Sub or any Subsidiary of Parent) except as
> permitted in Section 5.1(a)(xiv); provided, however, that following the receipt of
> an unsolicited Superior Proposal or a *bona fide* written unsolicited Takeover
> Proposal which the Board determines in good faith, after consultation with its
> outside financial advisor and outside legal counsel and after taking into account the
> legal, financial, financing and other aspects of such *bona fide* written unsolicited
> Takeover Proposal, that such Takeover Proposal is reasonably likely to result in a
> Superior Proposal made on or after the date hereof but prior to the date of the
> Special Meeting, in circumstances not otherwise involving a breach of this
> Agreement, the Company may, in response to such Superior Proposal or such
> Takeover Proposal and subject to compliance with Section 5.2(b) and Section
> 5.2(c), (A) request information from the Person making such Superior Proposal or
> such Takeover Proposal for the purpose of the Board informing itself about the
> Superior Proposal or Takeover Proposal that has been made and the Person that
> made it, (B) furnish information with respect to the Company to the Person making
> such Superior Proposal or such Takeover Proposal pursuant to a confidentiality

22

agreement, <u>provided that</u> (1) such confidentiality agreement contains substantially the same terms as (or terms no less favorable to the Company) than those contained in the Confidentiality Agreement dated as of June 16, 2014, between Parent and the Company (as it may be amended, the "<u>Confidentiality Agreement</u>") and (2) the Company advises Parent of all such nonpublic information delivered to such Person concurrently with its delivery to the requesting Person, and (C) participate in negotiations with such Person regarding such Superior Proposal or such Takeover Proposal; <u>provided</u> <u>further</u>, that the actions described in clauses (B) and (C) of the immediately preceding proviso may be taken only on or before the date the Company Shareholder Approval is obtained.

79.     In addition, Section 5.2(c) requires that the Company alert Teledyne of the existence of any competing proposal.  This notice must take place promptly and under no circumstances take longer than twenty-four hours.  As stated in the provision:

> The Company may take the actions described in <u>Section 5.2(b)(xx)</u> and <u>(yy)</u> only after (i) providing Parent prompt written notice (within 24 hours of receipt) advising Parent that the Board has received a Superior Proposal or that an Intervening Event has occurred, such notice also specifying, in the case of a Superior Proposal, the material terms and conditions of such Superior Proposal and identifying the Person making such Superior Proposal (unless identifying the Person would violate an obligation of confidentiality), and in the case of an Intervening Event, a reasonably detailed description of the Intervening Event[.]

80.     Sections 5.2(a)-(c) of the Merger Agreement provide for the only, and very limited, circumstances under which the Bolt Board is permitted to change its recommendation regarding the Proposed Transaction.  By the terms contained therein, Section 5.2(a) requires that the Board members determine that they are breaching their fiduciary duties by not negotiating with an interested third-party before entering into such negotiations.  Then, Section 65.2(c) requires the Board, after determining that the alternative bid is in fact superior, give Teledyne at least five business days' prior written notice before effecting a change in recommendation.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will end in favor of the Teledyne and piggy-back upon the due diligence of the foreclosed second bidder.

81.     Section 7.3(c) also provides for an unduly coercive termination fee of $7.5 million, reflecting nearly 4.5% of the entire transaction's value, to be paid by the Company to the Teledyne in the event that it chooses to pursue an alternative offer, thereby requiring that a competing bidder not only jump over all of the preclusive hurdles before being able to even make a bid, but then they must also pay a naked premium just to provide the Company with a superior offer.

82.     Compounding matters, certain members of the Board have executed the Shareholder Agreements, providing that, among other things, that 5.6% of the Company's stock will be voted in favor of the Proposed Transaction and against any alternative proposal.

83.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.

84.     Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**E. Defendants' Interest in the Proposed Transaction**

85.     Furthermore, certain of the Company's directors and officers stand to receive significant benefits and thus have reason to support the Proposed Transaction, which is otherwise against the best interests of Bolt's stockholders.  For example, the Proxy Statement reveals that each of the Individual Defendants stand to receive windfall financial benefits from the automatic

vesting of certain Company options and restricted shares – holdings that would have remained illiquid had the Company not determined to sell the Company.

| Name | Number of Shares Subject to Stock Options [1] | Cash-Out Payment for Stock Options ($) | Number of Unvested Restricted Shares (#) [2] | Cash-Out Payment for Unvested Restricted Shares ($) | Total Payment for Outstanding Equity ($) |
|---|---|---|---|---|---|
| **Executive Officers** | | | | | |
| Raymond M. Soto | — | — | 41,500 | 913,000 | 913,000 |
| Michael C. Hedger | — | — | 35,100 | 772,200 | 772,200 |
| Joseph Espeso | — | — | 2,100 | 46,200 | 46,200 |
| William C. Andrews | — | — | 8,600 | 189,200 | 189,200 |
| **Non-Employee Directors** | | | | | |
| Kevin M. Conlisk | 3,750 | 41,850 | 980 | 21,560 | 63,410 |
| Michael H. Flynn | 1,875 | 22,313 | 1,380 | 30,360 | 52,673 |
| George R. Kabureck | — | — | 1,380 | 30,360 | 30,360 |
| Stephen F. Ryan | 4,500 | 42,615 | 1,580 | 34,760 | 77,375 |
| Peter J. Siciliano | 3,750 | 41,850 | 680 | 14,960 | 56,810 |
| Gerald A. Smith | 3,750 | 41,850 | 980 | 21,560 | 63,410 |
| **Total** | **17,625** | **190,478** | **94,280** | **2,074,160** | **2,264,638** |

86.    Furthermore, each of the Individual Defendants and members of Company management have significant holdings of Bolt common stock – blocks that are nearly illiquid and their common form and for which these individual will receive the added benefit of instant liquidity of the quick sale to Teledyne.

|  | Amount of Shares of Common Stock Owned | Cash Value of Common Stock in Proposed Transaction |
|---|---|---|
| Raymond Soto | 216,059 | $4,753,298.00 |
| Michael Hedger | 96,352 | $2,119,744.00 |
| Joseph Espeso | 36,196 | $796,312.00 |
| Kevin Conlisk | 31,507 | $693,154.00 |
| Michael Flynn | 17,275 | $380,050.00 |
| George Kabureck | 17,017 | $374,374.00 |
| Stephen Ryan | 12,900 | $283,800.00 |
| Peter Siciliano | 7,925 | $174,350.00 |
| Gerald Smith | 27,249 | $599,478.00 |
| All Executive Officers and Directors as a Group | 487,877 | $10,733,294.00 |

87.     In addition to this liquidity benefit, Individual Defendants Soto, Hedger, and Espeso, along with Company Senior Vice President – Administration and Compliance and Secretary William C. Andrews, will receive exorbitant Golden Parachute Compensation – none of which would have been received had Bolt remained a standalone entity.

**Golden Parachute Compensation**

| Name | Cash [1] ($) | Equity [2] ($) | Pension/ Non-Qualified Deferred Compensation [3] ($) | Perquisites/ Benefits [4] ($) | Tax Reimbursement [5] ($) | Total [6] ($) |
|---|---|---|---|---|---|---|
| Raymond M. Soto [7] | 3,523,211 | 913,000 | — | 290,619 | — | 4,726,830 |
| Michael C. Hedger [8] | 3,171,833 | 772,200 | — | — | — | 3,944,033 |
| Joseph Espeso [9] | 690,000 | 46,200 | — | 22,104 | — | 758,304 |
| William C. Andrews [10] | 743,080 | 189,200 | — | 54,312 | — | 986,592 |

88.     Finally, Teledyne improperly induced certain members of the Board and Bold management to support the otherwise unfair terms of the Proposed Transaction by creating the expectation of future employment at the post-merger combined company.  Indeed, the Proxy

Statement reveals that "[i]t is anticipated that the named executive officers of Bolt following the effective date of the [Proposed Transaction] will have the same positions with the surviving corporation, except they shall not continue as directors of the surviving corporation."  By creating the expectation of securing more prestigious positions with the post-merger Company, Teledyne wrongfully influenced certain Individual Defendants, including Defendants Soto, Hedger, and Espeso, to endorse the Proposed Transaction, despite its unfair terms for Bolt's common shareholders.

89.     Accordingly, the Company's directors and officers stand to receive significant benefits and thus have reason to support the Proposed Transaction, which is otherwise against the best interests of the Company's stockholders.

**F.  The Materially Incomplete and Misleading Proxy Statement**

90.     Defendants filed the Proxy Statement with the SEC on September 17, 2014 in connection with the Proposed Transaction.  As alleged, the Proxy Statement, in contravention of the Board's fiduciary duties, omits material information that must be disclosed to Bolt's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

91.     The Proxy Statement omits material information with respect to the financial analyses performed by Johnson Rice which underpinned its ultimate fairness opinion; an opinion the Board relied upon in determining to enter into the Merger Agreement. This omitted information, if disclosed, would significantly alter the total mix of information available to Bolt's stockholders.

92.     For example, the Proxy fails to provide a valuation summary with Bolt's fully diluted shares outstanding, cash, debt, equity value (at the unaffected price for both companies and

the offer price for Forest), and enterprise value (at the unaffected price for both companies and the offer price for Forest).  If pricing multiples were calculated, the Proxy should disclose this information as well.

93.     With respect to Johnson Rice's *Selected Companies Analysis*, the Proxy fails to disclose the objective selection criteria used by Johnson Rice to select the sample of public companies.  In addition, the Proxy fails to disclose the company-by-company pricing multiples and financial metrics, as well as the observed multiples ranges.

94.     With Respect to Johnson Rice's *Selected Transactions Analysis*, the Proxy fails to disclose the identity of the transactions selected for either its Asset Light Deals analysis or its All Service Deals analysis.  Furthermore, the Proxy offers no information as to the objective selection criteria used by Johnson Rice to select the sample of precedent transactions, nor the transaction-by-transaction values, pricing multiples, and financial metrics.

95.     The *Discounted Cash Flow Analysis*, as summarized in the Proxy, is also materially deficient as it omits or misrepresents several key pieces of information necessary for Company stockholders to fully evaluate both the fairness of the deal and the credibility of the banker's analysis.

96.     First, the Proxy fails to provide Company stockholders with the cash flows used by Johnson Rice to perform its analysis under each of the three cases (base case, high case, and low case), thus rendering any observer unable to perform his or her own discounted cash flow analysis to check the integrity of the Johnson Rice analysis.

97.     Second, the Company nor its banker provide any explanation for Johnson Rice's decision to calendarize Company projections in performing its discounted cash flow analysis.  As Bolt operates on a fiscal year ending June 30th and this fairness presentation was ultimately

presented to the Board on September 3, 2014 (just nine days before the Company released its Annual Report on Form 10-K for the Fiscal Year ending June 30, 2014), a more temporally appropriate discounted cash flow result would have been achieved by using actual financial results for the Fiscal Year of 2014 rather than management's projections and the subsequent adjustments Johnson Rice would have to make in order to calendarize those projections.

98.     Additionally, the Proxy fails to disclose the bases for the 2016 to 2018 EBITDA assumptions applied in each of the base case, high case, and low case.  These projections were not included in the management projections offered in the Proxy, thus, if Johnson Rice is responsible for deriving these assumptions, the Proxy must explicitly state so, along with any input the banker used to derive the assumption.  Conversely, if the Company's management provided these EBITDA figures, the Proxy should acknowledge such.

99.     The Proxy also fails to disclose why, in its *Discounted Cash Flow Analysis*, Johnson Rice utilized a free cash flow definition that omits taxes as a deduction from projected EBITDA along with changes in working capital and capital expenditures.

100.     Johnson Rice's *Discounted Cash Flow Analysis* is also materially flawed because of the banker's use of certain published information from Bloomberg in its Capital Asset Pricing Model to derive the Company's cost of equity.  As stated in the Proxy, based on this Bloomberg information, the Company had a 9.36% cost of equity, yielded from an expected market return of 9.72%, a risk free rate of 2.42%, and a beta of 0.95.  From these numbers, the implied risk premium is 7.3% (the expected market return *less* the risk free rate), much higher than the risk free rate figures produced in peer-reviewed sources, such as those produced by Ibbotson Associates and often relied on by financial advisors undertaking similar analysis.  The Proxy fails to disclose this

to the Company's stockholders, nor provide any justification for Johnson Rice's use of the Bloomberg figures as opposed figures from generally accepted industry sources.

101.    Finally, as stated in the Proxy, "Johnson Rice also calculated a discounted cash flow analysis on the Company's 'base case' using a 15% cost of capital as the discount factor." What the Proxy is silent on, however, is why this additional analysis was performed and the basis for applying the 15% discount factor.

102.    Ultimately, these material omissions and misstatements in the Proxy render the Company's stockholders misinformed as to the true value of their holdings in Bolt and the fairness of the Proposed Transaction.  As such, unless rectified, Bolt stockholders will be forced to cast an uninformed vote at the November 17, 2014 stockholder meeting.

103.    Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

### CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

104.    Plaintiffs repeat all previous allegations as if set forth in full herein.

105.    The Individual Defendants have violated their fiduciary duties owed to the public stockholders of Bolt and have acted to put their personal interests ahead of the interests of Bolt stockholders.

106.    The Individual Defendants' recommendation of the Proposed Transaction will result in a change of control of the Company which imposes heightened judicial scrutiny of the Board's process and its obligation to maximize Bolt's value for the benefit of the stockholders.

107.    The Individual Defendants have breached their fiduciary duties owed to the stockholders of Bolt because, among other reasons:

a.      they failed to take steps to maximize the value of Bolt to its public stockholders and took steps to avoid competitive bidding;

b.      they failed to properly value Bolt; and

c.      they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

108.    Moreover, the Individual Defendants have caused Bolt to file with the SEC and otherwise make available to Bolt shareholders a materially incomplete and misleading Proxy Statement.  The Proxy Statement is materially deficient and misleading due to the statements and omissions alleged herein, among others.  Unless and until the Proxy Statement and its disclosures to Bolt shareholders are revised, corrected, and/or supplemented to remedy these deficiencies, Bolt shareholders will be in the position of having to render a decision as to whether or not to vote their Bolt shares in support of the Proposed Transaction based on a materially incomplete and misleading informational landscape.

**COUNT II**
**Aiding and Abetting**
**(Against Teledyne and Merger Sub)**

109.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Bolt's assets and will be deprived of the benefits of a value-maximizing transaction.

110.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

111.     Plaintiffs and the Class have no adequate remedy at law.

112.     Plaintiffs repeat all previous allegations as if set forth in full herein.

113.     As alleged in more detail above, Defendants Teledyne and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.  Defendants Teledyne and Merger Sub knowingly assisted the Individual Defendants' aforementioned breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.

114.     Moreover, in an effort to secure the support of the Individual Defendants for the unfair terms of the Proposed Transaction, Defendants Teledyne and Merger Sub improperly created the expectation of the receipt of material benefits not shared by Bolt's other common stockholders for certain Individual Defendants.  As alleged in more detail above, Defendants Teledyne and Merger Sub improperly sought to influence the named executive officers of Bolt, including certain of the Individual Defendants, with the expectation of continued employment following the close of the Proposed Transaction.  These representations regarding continued employment by Defendants Teledyne and Merger Sub constitute aiding and abetting of the Individual Defendants' breaches of fiduciary duties.

115.     As a result, Plaintiffs and the Class members are being harmed.

116.     Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants jointly and severally, as follows:

A.      Declaring this action to be a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

B.      Enjoining, preliminarily and permanently, the Proposed Transaction;

C.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiffs and the Class rescissory damages;

D.      Directing that Defendants account to Plaintiffs and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

E.      Awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

F.      Granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

**By:**    */s/ Nancy A. Kulesa*
Nancy A. Kulesa (CT 25384)
Shannon L. Hopkins
Sebastiano Tornatore
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (212) 363-7500
Fax: (866) 367-6510
nkulesa@zlk.com
shopkins@zlk.com
stornatore@zlk.com

*Counsel for Plaintiffs Armin Walker and Mark Halstrom*

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc Ackerman
2 Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Tel.: (610) 667-6200
Fax: (610) 667-9029

*Counsel for Plaintiff Armin Walker*

**POMERANTZ LLP**
Gustavo F. Bruckner
Anna Karin F. Manalaysay
Matthew L. Tuccillo
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665

*Counsel for Plaintiff Shiva Y. Stein*

**IZARD NOBEL LLP**
Nicole A. Veno
Jeffrey S. Nobel
Mark P. Kindall
IZARD NOBEL LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: 860.493.6292
Fax: 860.493.6290

-and-

**MILBERG LLP**
Kent A. Bronson
One Pennsylvania Plaza
49th Floor
New York, New York 10119
Tel: 212.594.5300

*Counsel for Plaintiff Andrew Post*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on October 23, 2014, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this wiling will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of electronic Filing. Parties may access this filing through the Court's CM/ECF system.

4845-3570-4096, v.  1